UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 22-60079-CR-RUIZ/STRAUSS

UNITED STATES OF AMERICA,

       Plaintiff,

vs.

XAVIER RIVERS,

       Defendant.

_____/

## REPORT AND RECOMMENDATION RE: COMPETENCY

**THIS CAUSE** has been referred to me by the Honorable Rodolfo A. Ruiz, II to conduct a hearing regarding the competency of the Defendant, Xavier Rivers.   [DE 45].   On July 17, 2023, I held a hearing at which I heard arguments from counsel.   Thereafter, on September 28, 2023, I held an evidentiary hearing at which I received evidence and heard testimony from Dr. Katherine E. Sunder.   Having considered the relevant portions of the record (including DE 24, 33, 37, 38, 39, 43, 48, 51, 53, 54, and 55), Dr. Sunder's testimony [DE 51], which I find to be credible, the other evidence admitted in connection with the September 28, 2023 evidentiary hearing, and the arguments of counsel, I respectfully recommend that the District Court find the Defendant is competent to stand trial.

## I.     BACKGROUND

The Defendant, Xavier Rivers, is charged by Indictment with one count of Attempted Enticement of a Minor, in violation of Title 18, United States Code, Section 2422(b), and one count of Attempted Production of Child Pornography, in violation of Title 18, United States Code,

Section 2251(a).  [DE 8].  On August 19, 2022, the Defendant moved the Court for an order requiring the Bureau of Prisons (BOP) to conduct a competence evaluation, based on defense counsel's observation from meetings with the Defendant that the Defendant's "comprehension as to the court process and procedure, as well as his comprehension of the possible outcomes in his case appear limited and below the level necessary for competence to proceed."  [DE 17].  The Court granted that motion and ordered a competence evaluation.  [DE 18].

### A. <u>First Evaluation</u>

On December 15, 2022, Dr. Lisa Feldman submitted a report detailing a competency evaluation she and other staff at the Federal Detention Center had conducted.  [DE 24].  Dr. Feldman's report concluded that the Defendant has an Intellectual Disability (Mild) and Major Depressive Disorder.  *Id*.  However, despite these limitations, Dr. Feldman concluded that the Defendant is competent to stand trial.  *Id*. at 15.  Specifically, Dr. Feldman concluded that the Defendant "demonstrated a factual and rational understanding of the charges against him, has an understanding of courtroom proceedings, and has the capacity to assist his attorney in his own defense."  *Id*.

On March 1, 2023, the Court conducted a hearing, pursuant to 18 U.S.C. § 4241(a), to address the Defendant's mental competency.  [DE 31, 39].  After hearing testimony from the Defendant's mother and Dr. Feldman, the Court concluded that the Defendant is competent to proceed to trial and/or enter a plea of guilty.  [DE 33].  On March 7, 2023, the Defendant filed a motion to conduct a second competence evaluation.  [DE 37].  This second motion echoed and elaborated points defense counsel had made at the March 1 hearing in argument and on cross-examination that critiqued Dr. Feldman's conclusions.  *Id*.  Specifically, the second motion criticized Dr. Feldman's interpretation and reliance on certain testing she had administered – the

Wechsler Adult Intelligence Scale (WAIS-IV), and, particularly, its "Working Memory Index" (WMI) component, the Evaluation of Competency to Stand Trial Revised (ECST-R), and CAST-MR or CAST ID) despite warnings that these tests may be unreliable, particularly with a person with intellectual disability and anxiety. *Id*. at 2-10. The second motion further argued that Dr. Feldman had reached her conclusions after minimal conversational interaction with the Defendant and without awareness of circumstances occurring during the Defendant's incarceration (including a threatened hunger strike, a determination that the Defendant had been non-compliant with taking medication, and that the Defendant had activated his "duress button"). *Id*. at 11. The second motion consequently asked the Court to order a second evaluation at a different BOP facility. *Id*. at 12. The Court granted that motion and ordered a second examination to occur at the Federal Medical Center in Butner, North Carolina. [DE 38].

**B. <u>Second Evaluation</u>**

On June 1, 2023, Dr. Katherine E. Sunder, a forensic psychologist, submitted her report regarding the Defendant's second competency evaluation. [DE 43]. As described in the report, Dr. Sunder reviewed and considered, among other things, portions of the transcript from the March 1, 2023 competency hearing, various records from the BOP, investigative reports and other evidence regarding the Defendant's alleged offenses, and academic and mental health records.[1] *Id.* at 3-4. Dr. Sunder also contacted Dr. Feldman, defense counsel, the assigned AUSA, and the Defendant's mother and aunt (with whom she spoke for approximately 90 minutes). *Id*. at 4. As part of her evaluation, Dr. Sunder also interviewed the Defendant on five occasions, for a total of

---

[1] The referenced BOP and mental health records appear to include descriptions of the incidents or information to which defense counsel referred in his cross-examination of Dr. Feldman, which had either occurred after Dr. Feldman's examination or about which Dr. Feldman was unaware.

approximately five hours. *Id*. at 3. These interactions included administering an Inventory of Legal Knowledge (ILK) and Wide Range Achievement Test – 5 (WRAT 5).

Ultimately, Dr. Sunder concluded that, "while Mr. Rivers has been diagnosed with a mental disease or defect, these do not render him unable to understand the nature and consequence of the proceedings against him or to assist properly in his defense." *Id*. at 24. As to the mental disease or defect at issue, Dr. Sunder identified Intellectual Disability (Mild), retaining the diagnosis he has carried for many years (but noting that there is "compelling data" to suggest he has compensated and improved on several adaptive skills compared to the adaptive deficits his historical records describe). *Id*. at 18-19. Dr. Sunder also diagnosed Unspecified Depressive Disorder. *Id*. at 19. While recognizing that the combination of these conditions "could impact psycho-legal abilities," Dr. Sunder assessed that the Defendant "understands his charges, and he appreciates the seriousness and the potential consequences." *Id*. at 23. She further assessed that he "has adequate reasoning abilities to apply learned concepts (i.e., plea bargain) to his own situation" and understands the role of his defense attorney (even if he relies on his mother's guidance). *Id*. at 24.

In reaching her conclusion, Dr. Sunder detailed her assessment of the Defendant's psycho-legal abilities over the course of three meetings on May 3, 9, and 17, 2023. Those interviews included discussions of the roles of various courtroom personnel (including the judge, prosecutor, defense attorney, and jury), with the Defendant receiving education if he initially said he did not know sufficient information. *Id*. at 20. While the Defendant resisted discussing his personal charges, he showed an understanding of how many charges he faces (two), the meaning of pleading guilty ("you accept the consequences"), and the meaning of pleading not guilty (someone saying "they did not do it"). *Id*. He also acknowledged that someone would not simply be sent home if

they plead guilty and reported that he was facing a mandatory minimum sentence of "15 years," without alternatives like probation or house arrest (though he could not describe probation or house arrest).  *Id*.  At his second interview with Dr. Sunder (six days after the first), the Defendant correctly described the roles on which he had received education.  *Id*. at 21.  He showed an understanding of how a judge or jury might reach a verdict and what sorts of things might constitute evidence, including in a case similar to his.  *Id*.  Furthermore, he showed an understanding of the advantages and disadvantages of plea bargaining compared to a trial.  *Id*.

    C.  **Dr. Sunder's Testimony**

Dr. Sunder is employed as a forensic psychologist at the Federal Correctional Institute in Butner, North Carolina.  [DE 51] at 6.  She explained that the Defendant suffers from depression and intellectual disability (mild).  *Id*. at 8, 52; *see also* [DE 43] at 19 (noting diagnoses of intellectual disability (mild) and unspecified depressive disorder).  However, the Defendant's depression is situational and is not having any major impact – if any impact at all – on the Defendant's competency.  [DE 51] at 8-9.  Rather, the potential competency issues being evaluated here stem from the Defendant's intellectual disability.  *Id*.  No medication exists to cure such a disability.  *Id*.

It is Dr. Sunder's understanding that one must generally know, or be able to learn and understand, how the different roles in the courtroom (*e.g.*, prosecutor) work in order to be competent.  *Id*. at 11-12.  Advance knowledge is not required so long as the person has the capacity to learn.  *Id*. at 12.  Dr. Sunder testified that she recognizes the Defendant has an intellectual disability and that he is not functioning like the average individual in society, but she opined that the Defendant "still has general capacities in being able to learn information and apply information and to be able to talk to . . . his attorney, [] if he is willing to do so."  *Id*. at 21-22.

When providing education regarding courtroom roles, Dr. Sunder considers, *inter alia*, whether a defendant understands the adversarial nature of the court system, that a prosecutor is against the defendant, that the defense attorney is representing the defendant and has the defendant's best interest at heart, and similar concepts. *Id.* at 15-16. When Dr. Sunder first asked the Defendant (in May 2023) if he knew what the role of a prosecutor was, the Defendant said he did not know – even though he apparently knew or was informed about the role of a prosecutor six months earlier (with Dr. Feldman). *See id.* at 14-17. However, the Defendant did retain such knowledge (regarding the role of a prosecutor) over a two-week period with Dr. Sunder, demonstrating that the Defendant did have long-term memory. *Id.* at 86-87.

While possible that the Defendant lost knowledge regarding the role of a prosecutor in the six months between December 2022 and May 2023 (perhaps due to his intellectual disability), Dr. Sunder credibly testified that the Defendant's "I don't know" response when she first asked him about the role of a prosecutor was more likely the result of low effort. *Id.* at 16-17, 22-23, 85-88. Dr. Sunder explained that the Defendant's low effort was evidenced by, for instance, the fact that the Defendant provided less general background information – *e.g.*, information regarding where the Defendant was born and raised, the Defendant's education and work history, and the Defendant's behavior in school – to Dr. Sunder than the Defendant had provided to Dr. Feldman. *Id.* at 85. Dr. Sunder credibly testified that this showed the Defendant did not want to give more information and that he was putting in low effort because one does not simply lose such autobiographical information. *Id.* Additionally, Dr. Sunder explained that the Defendant had a general understanding of why he was transferred to Butner but provided some inconsistent responses when asked why he was there – telling Dr. Sunder he did not know despite previously acknowledging to someone else that he knew why. *Id.* at 22-23, 85-86. She further noted his

tendency to start answering "I don't know" to questions on the WRAT 5 as they got harder, even though he was able to ultimately answer several of these questions with encouragement and prompting. *Id.* at 23.

Regarding the role of a judge, in Dr. Sunder's first session with the Defendant, he answered that a judge's role is "to judge you." *Id.* at 31. When asked what types of decisions a judge makes, the Defendant stated, "hard ones." *Id.* And when asked if a judge determines the verdict, the Defendant responded, "yes, guilty or not guilty." *Id.* However, the Defendant stated he was not sure what the role of a jury is – so, Dr. Sunder provided the Defendant with basic education regarding the role of a jury. *Id.* at 33.

When Dr. Sunder attempted to discuss the Defendant's case with him, the Defendant often stated that he did not want to talk about it. *Id.* at 23, 27. The Defendant expressed hesitancy in discussing his case because he thought that Dr. Sunder would use "reverse psychology" on him and that whatever he said would go into Dr. Sunder's report. *Id.* at 27. The Defendant indicated to his mother that Dr. Sunder seemed to be trying to force the Defendant to confess. *Id.* at 28. Although Dr. Sunder was not trying to use reverse psychology or to force the Defendant to confess, Dr. Sunder explained that the Defendant's sentiments were not abnormal as many individuals in the Defendant's place are skeptical of evaluators in Dr. Sunder's role. *Id.* at 28-30. Moreover, the Defendant's concern that information he provided could be used against him was rational. *Id.* at 28-29, 54-55.

Because the Defendant did not want to discuss his case with Dr. Sunder, Dr. Sunder used hypotheticals to see if the Defendant could apply his courtroom knowledge and to ensure that the Defendant was not simply parroting back information. *Id.* at 34-35. Dr. Sunder's use of hypotheticals with the Defendant demonstrated that the Defendant was able to take in, reason with,

and apply information, which factored into Dr. Sunder's determination that the Defendant is competent.  *Id.* at 36.   Additionally, although the Defendant did not want to discuss the facts of his case, he did recognize that he faces a mandatory minimum sentence of 15 years and understands that he could be facing significant prison time.   *Id.* at 38.

As part of her evaluation, Dr. Sunder also considered the results of the Defendant's IQ testing – from both 2008 (when the Defendant was 15) and December 2022 (when Dr. Feldman evaluated the Defendant).   The following chart reflects the Defendant's scores:

|  | 2008 | 2022 |
|---|---|---|
| Full-Scale IQ | 54 (extremely low) | 68 (extremely low) |
| Verbal Comprehension Index (VCI) | 55 (extremely low) | 68 (extremely low) |
| Perceptual Reasoning Index (PRI) | 49 (extremely low) | 75 (borderline) |
| Working Memory Index (WMI) | 86 (low average) | 89 (low average) |
| Processing Speed Index (PSI) | 70 (borderline) | 62 (extremely low) |

*Id.* at 43-45; [DE 43] at 10, 14 & n.2.   Dr. Sunder testified that research has shown that individuals with an IQ of 65 and above have historically been found competent and that individuals with scores below 55 have generally been found incompetent; individuals between 55 and 65 "are usually 50/50."   [DE 51] at 53.

However, as reflected in the chart above, the 2022 testing revealed a large spread between the Defendant's lowest (62) and highest (89) scores – a spread of almost two standard deviations (one standard deviation is 15).   *Id.* at 44, 101-02.   In such a situation, psychologists will often look at an individual's strengths and weaknesses rather than simply using a single IQ score.   *Id.* at 44.   With the Defendant, Dr. Sunder found that some of his strengths and abilities were somewhat higher than what the Defendant's IQ test revealed – specifically, in the areas of reading and sentence comprehension.   *Id.* at 46.

Ultimately, Dr. Sunder testified that while the Defendant did not provide robust answers to certain factual questions,

> he was generally . . . amiable [sic] to education. He was able to retain that over a several-week period and be able to use that information to answer hypothetical questions. So while he is not a perfect defendant, he still was able to take in information and generally apply it. Again, it's not perfect for Mr. Rivers. When it came to the rational assessment or his rational understanding of his charges and his ability to assist in his defense, as I said in my report, that was a very challenging assessment, for a number of reasons, including his not wanting to discuss some of the events or his cases. And certainly evaluating an intellectual disabilit[y] in this realm can be challenging as well. And – but regardless, what I was able to look at in that is he is able to appreciate the gravity of his situation, that he could spend a significant amount of time in prison, and that, taken together, he was able to make a rational choice to then not discuss anything with me. In terms of his ability to assist in his defense, this comes down to, is he unable, or is he unwilling to do so? Again, another very challenging assessment for Mr. Rivers. But he is able to converse and he is able to conduct himself appropriately, and he is able to do such things. Now, whether he is willing to do so, if he is willing to talk to somebody, that's another question, but I don't see that as being a part of his intellectual disability at this time.

*Id.* at 57-58.   Dr. Sunder also noted that notwithstanding the Defendant's intellectual deficits, he was able to obtain a driver's license and work as an umpire.   *Id.* at 59.   Additionally, Dr. Sunder considered a video of the Defendant's police interrogation, noting that the Defendant was able to answer open-ended questions and engage in meaningful conversation, even asking questions about the charges against him and whether he would be able to obtain bail.   *Id.* at 60.

## II.    <u>LEGAL STANDARD</u>

"A defendant is not fit to stand trial if he is 'suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense.'"   *United States v. Bradley*, 644 F.3d 1213, 1267 (11th Cir. 2011) (quoting 18 U.S.C. § 4241(a)).   "The standard for competency to stand trial is whether the defendant has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding—and whether he has a rational as

well as factual understanding of the proceedings against him." *Id.* at 1268 (quoting *United States v. Hogan*, 986 F.2d 1364, 1371 (11th Cir. 1993)); *see also United States v. Utsick*, 45 F.4th 1325, 1338 (11th Cir. 2022. "[T]he standard for mental competence does not require that a defendant have a clear understanding of legal terminology, or that he be able to read and understand a legal document without assistance." *United States v. Greene*, 767 F. App'x 793, 797 (11th Cir. 2019). "A defendant bears the burden of showing his mental incompetence by a preponderance of the evidence." *Id.* (11th Cir. 2019) (citing *Bradley*, 644 F.3d at 1268); *see also Perkins v. United States*, 73 F.4th 866, 876 (11th Cir. 2023) ("A petitioner 'is entitled to no presumption of incompetency and must demonstrate his . . . incompetency by a preponderance of the evidence.'" (quoting *Lawrence v. Sec'y, Fla. Dep't of Corr.*, 700 F.3d 464, 481 (11th Cir. 2012))).

"Whether a defendant is competent to stand trial is left to the sound discretion of the trial court." *United States v. Henry*, 151 F.3d 1031 (4th Cir. 1998). "[A]n expert opinion as to competency is not binding on the district court if there is reason to doubt it." *United States v. Fuenmayor-Arevalo*, 490 F. App'x 217, 225 (11th Cir. 2012) (citing *United States v. Izquierdo*, 448 F.3d 1269, 1279 (11th Cir. 2006)). "While the experts may provide evidence about the defendant's state of mind and abilities, the ultimate decision about competency lies with the district court." *United States v. Puerto*, 392 F. App'x 692, 710 (11th Cir. 2010) (citing *United States v. Makris*, 535 F.2d 899, 907 (5th Cir. 1976)); *see also United States v. Williams*, No. 21-CR-20515, 2023 WL 3902135, at *17 (S.D. Fla. Apr. 26, 2023), *report and recommendation adopted*, 2023 WL 3901469 (S.D. Fla. June 8, 2023) ("The determination of whether a defendant is mentally competent to stand trial is a question left to the sound discretion of the district court, with the advice of psychiatrists [or other mental health professionals]. The medical opinion of experts as to the competency of a defendant to stand trial is not binding on the court, since the law imposes the

duty and responsibility for making the ultimate decision of such a legal question on the court and not upon medical experts." (citation omitted)).

### III.    <u>DISCUSSION</u>

As a preliminary matter, there does not appear to be any dispute that the Defendant suffers from a mental disease or defect.   Specifically, the Defendant has an intellectual disability (mild). However, the mere existence of this intellectual disability does not render the Defendant incompetent *per se*.   *See Perkins*, 73 F.4th at 876 ("'Not every manifestation of mental illness demonstrates' that the defendant is incompetent; 'rather, the evidence must indicate a present inability to assist counsel or understand the charges' at the time of the relevant proceeding, such as trial or sentencing. . . . Likewise, neither low intelligence nor mental deficiency can be equated with mental incompetence." (internal citations omitted)); *McCune v. Estelle*, 534 F.2d 611, 612 (5th Cir. 1976) ("[L]ow intelligence or weird behavior can not be equated with mental incompetency to stand trial."); *Greene*, 767 F. App'x at 797 ("In the absence of evidence that the defendant was incapable of understanding the proceedings sufficiently to assist counsel, 'low intelligence, mental deficiency,' or signs of mental illness are insufficient to show incompetence." (citing *Pardo v. Sec'y, Fla. Dep't of Corr.*, 587 F.3d 1093, 1101 (11th Cir. 2009))); *United States v. Deruiter*, No. 2:14-CR-46-FTM-38MRM, 2017 WL 9360880, at *26 (M.D. Fla. May 16, 2017), *report and recommendation adopted*, 2017 WL 3308967 (M.D. Fla. Aug. 3, 2017) ("[A] review of relevant case law demonstrates that a low IQ does not necessarily render a defendant incompetent to proceed.").   Moreover, Dr. Sunder recognized that it was especially necessary to evaluate the Defendant's individual strengths and weaknesses rather than simply relying on a single IQ score because of the large difference between the Defendant's lowest (62) and highest

(89) scores.[2]   At any rate, because the Defendant's IQ score does not render him automatically competent (or incompetent), I must assess the Defendant's ability to understand the nature and consequences of the proceedings against him and the Defendant's ability to properly assist his counsel in his defense based on the evidence presented by the parties.

### A. Defendant's Understanding of Proceedings

The Defendant failed to satisfy his burden of showing that he is unable to understand the nature and consequences of the proceedings against him.   Rather, based on the evidence presented, I find that the Defendant appears to have a rational and factual understanding of the proceedings.   At a minimum, he has failed to show by a preponderance of the evidence that he does not.

First, the Defendant seems to understand the adversarial nature of criminal proceedings. When he first met with Dr. Sunder, he was asked who a defendant in a criminal case is, and answered, "I guess I am."   [DE 43] at 20.   He also recognized that the role of a defense attorney is to "protect and defend" a defendant from the charges.   *Id.*   Regarding the role of a prosecutor, the Defendant initially told Dr. Sunder that he did not know; however, after being provided with education, the Defendant used that education to reason that the prosecutor is "against" a defendant and wants to put the defendant away in jail.   *Id.*   No evidence was presented to indicate that the Defendant misapprehends the prosecutor (or the Court) to be on the Defendant's side.   Rather, the evidence suggested that the Defendant recognizes that the only player in the courtroom in the Defendant's corner is defense counsel.

---

[2] Especially where an individualized assessment is necessary, the mere fact that the DSM-5 lists certain symptoms or characteristics that may be associated with an intellectual disability does not necessarily mean that such symptoms or characteristics are present (and to the same degree) in all individuals with such an intellectual disability.

A larger question perhaps exists regarding whether the Defendant lost certain knowledge – for example, regarding the role of a prosecutor – during the five months between when he met with Dr. Feldman and when he first met with Dr. Sunder – given that the Defendant initially told Dr. Sunder he did not know the role of a prosecutor.  Dr. Sunder explained that there are two competing hypotheses.  Either (1) the Defendant lost his knowledge due to his intellectual disability, or (2) the Defendant stating he did not know certain answers was the product of low effort.  [DE 51] at 87-88.  The first possibility – that the Defendant did not retain knowledge due to his intellectual disability – would not only bear on his understanding of the proceedings against him but also undermine confidence in his ability to retain explanations and advice from his attorney and ultimately assist his attorney in his defense.

However, as discussed above, I find that Dr. Sunder credibly testified that the Defendant's responses suggesting lost knowledge were more likely the result of low effort.  The Defendant disagrees with the "low effort" characterization, arguing that the answers he provided to certain questions actually shows that he was making an effort.  But Dr. Sunder did not state that the Defendant put forth low effort at all times, only at certain times.   And Dr. Sunder's "low effort" conclusion is supported by the fact that Defendant quickly responded "I don't know" as an initial answer to numerous questions to which he ultimately gave more detailed answers upon further prompting.  *See* [DE 43] at 20-21; [DE 51] at 23.  Moreover, Dr. Sunder explained that the Defendant was able to retain education she provided to him in subsequent meetings with her, showing that the Defendant does have long-term memory capabilities.  [DE 51] at 86-87. Furthermore, the Defendant did not provide the Court with any countervailing opinion to counter Dr. Sunder's credible explanation that low effort was more likely than a loss of knowledge.

The Defendant also contends that his answer regarding the role of a judge shows that he does not understand the roles of judge and jury.   Specifically, when asked whether the judge decides the verdict, the Defendant responded "yes."   Again, the Defendant argues that this either shows a fundamental misunderstanding of the proceedings or a loss of previous knowledge that the jury – not the judge – decides the verdict.   However, the Defendant's answer to this question is not as probative of the "loss of knowledge" theory as the Defendant argues it is.   The Defendant's argument rests on the presumption that because Dr. Feldman found he was competent he must have previously known the correct answer and lost that understanding.   But it is not clear what the Defendant actually understood about the role of a judge at the time of Dr. Feldman's evaluation compared to when the Defendant answered Dr. Sunder's questions about whether the judge decides the verdict.   Dr. Feldman's report describes administering the CAST*MR to the Defendant.   The report does not disclose the specific answers the Defendant provided to each question.   Rather, it reports the Defendant's overall score (86%) and his scores in various subcategories, concluding that the Defendant "demonstrated good factual and rational understanding of the legal system, including the roles and responsibilities of courtroom personnel." [DE 24] at 14-15.

Dr. Feldman did testify that she asked questions that assessed the roles of each person in the courtroom, but she did not indicate what questions she asked or what answers the Defendant provided.   [DE 39] at 98.   And her testimony suggested that she simply asked the questions on the CAST*MR.   *See id.* at 99.   Notably, though, the CAST*ID (formerly known as the CAST*MR) admitted into evidence at the hearing with Dr. Feldman itself seems imprecise about the role of judge and jury.   Specifically, the question asking what the judge does indicates that the correct answer is "decides the case," and the question asking what the jury does indicates that the

14

correct answer is "decides the facts of the case."   [DE 35-14] at 2.   Thus, the Defendant's "yes" answer to Dr. Sunder's question about whether the judge decides the verdict seems to indicate that the Defendant did retain concepts he knew when he met with Dr. Feldman (even if these concepts were not taught with the legal precision a lawyer would convey).   And Dr. Sunder credibly testified that what is most significant is whether a defendant is capable of learning and understanding the roles of courtroom personnel (not necessarily whether they know the roles at the outset without being provided any education).   Based on Dr. Sunder's testimony, I find that the Defendant was amenable to education regarding the roles of courtroom personnel, and the Defendant was able to retain that education from one meeting to the next with Dr. Sunder, thereby demonstrating his ability to learn and understand.[3]

The evidence also demonstrated that the Defendant appears to understand the consequences of these proceedings.   He recognized on several occasions that he is facing a mandatory minimum of 15 years, and Dr. Sunder credibly testified that "he is able to appreciate the gravity of his situation, that he could spend a significant amount of time in prison."   [DE 51] at 38, 57-58; [DE 43] at 20, 23.   Phone calls between the Defendant and his mother also indicated that the Defendant understood the consequence of prison – he expressed a desire to go home and not to prison, and stated, "all they trying to do is throw me in prison."   [DE 43] at 16.   While the Defendant did also express to Dr. Sunder that he wanted to go home and was disappointed that he was not previously found incompetent and sent home, this is not an indication that he does not understand

---

[3] The Defendant also contends that because Dr. Sunder had not spoken with the Defendant since May 2023, she could not testify at the September 2023 hearing whether the Defendant still retained his knowledge regarding the roles of courtroom personnel at that time.   It is true that what matters most is the Defendant's competency *at the time of trial*.   However, the Defendant presented no evidence showing that he did not retain the knowledge and understanding he exhibited when he met with Dr. Sunder.   And significantly, it is the Defendant's burden here.

the consequences of these proceedings.   Moreover, the Defendant has recognized that a defendant does not get to simply go home if he pleads not guilty.   *Id.* at 20.

Furthermore, to the extent that Dr. Sunder found it difficult to assess the Defendant's rational understanding of the charges against him and the potential consequences, such difficulty stems primarily from the Defendant's unwillingness to discuss his case with her.   Ultimately, though, the Defendant has the burden here, and he has failed to meet that burden.   To the extent a question exists regarding the Defendant's understanding of potential consequences, there is an absence of proof to demonstrate that the Defendant does not understand the consequences, particularly due to his decision to refuse to engage with Dr. Sunder regarding the charges in this case.   Now, the Defendant's decision to not discuss the charges was certainly rational – he expressed to his mother that he was afraid what he said could be used against him in court.   *See* [DE 43] at 22.   Nonetheless, in light of the limited evidence regarding whether the Defendant understands the charges and consequences here, and given that there is some (albeit not extensive) evidence that the Defendant has some basic understanding, the Defendant has not met his burden. In other words, he has not shown that he is unable to understand the nature and consequences of these proceedings or that he lacks a rational and factual understanding of these proceedings.

## B.  Defendant's Ability to Assist in His Defense

The Defendant failed to satisfy his burden of showing that he is unable to assist properly in his defense.   Rather, based on the evidence presented, I find that the Defendant has *sufficient* present ability – albeit not optimal ability – to consult with his counsel with a reasonable degree of rational understanding.

Some judges in this District and the Middle District of Florida have considered the following eight factors in assessing whether a defendant has sufficient present ability to consult with counsel:

> 1) the state of the defendant's memory, since he should be able to relate pertinent facts, names and events to his attorneys (although the defendant need not remember every fact that trial might encompass); 2) the extent to which relevant evidence could be reconstructed from communications made by the defendant to his counsel or from independent sources; 3) an adequate ability to review and evaluate documents and other written evidence bearing on the case; 4) an appreciation of the Government's evidence against him; 5) the ability to consider the wisdom of taking a course other than standing trial on the merits; 6) the ability to decide objectively whether to exercise his constitutional right to take the stand, and if he does take the stand, the ability to testify in an intelligent, coherent and relevant manner; 7) the ability to remain sufficiently alert and responsive so as to follow and recognize any discrepancies in the testimony of witnesses; and 8) the ability to discuss the testimony with his attorneys and to postulate questions to the witnesses through counsel.

*United States v. Chandler*, No. 6:19-cr-137-Orl-18LRH, 2020 WL 2735917, at *16 (M.D. Fla. May 5, 2020), *report and recommendation adopted*, 2020 WL 2735424 (M.D. Fla. May 26, 2020) (quoting *United States v. Giraldo*, No. 2:09-cr-85-FtM-36SPC, 2011 WL 7946037, at *3 (M.D. Fla. Oct. 24, 2011)); *United States v. Daking*, No. 12-14069, 2013 WL 3072209, at *1 (S.D. Fla. June 18, 2013); *United States v. Rothman*, No. 08-20895-CR, 2009 WL 426282, at *4 (S.D. Fla. Feb. 19, 2009).   The foregoing factors are by no means binding, dispositive, or exhaustive, but I have considered these factors (to the extent they apply), as well as any other relevant circumstances.

Regarding the first factor, both Dr. Feldman and Dr. Sunder noted that the Defendant did not appear to have deficits in memory.   Specifically, Dr. Feldman stated in her report that the Defendant's "memory functioning appeared intact for immediate, remote, and recent events." [DE 24] at 10.   And Dr. Sunder described the Defendant as a "fair historian" and noted that while

the Defendant's mother reported the Defendant has memory deficits, Dr. Sunder did not observe such deficits during her evaluation of the Defendant.   [DE 43] at 4, 17.

Second, to the extent the Defendant has difficulty remembering relevant facts, the most salient facts here may be reconstructed.   That is because the charges against the Defendant appear to be largely based on written communications between the Defendant and an undercover FBI agent.

Third, the Defendant's VCI and PSI scores, which were both in the extremely low range, do raise some doubts regarding the Defendant's ability, as a general matter, to review and evaluate documents and written evidence.   However, as indicated above, a large portion of written evidence in this case is likely to consist of communications between the Defendant and an undercover FBI agent.   Notably, in the video of the Defendant's post-arrest questioning, the Defendant acknowledged writing the messages – to the undercover agent – and was able to follow along as the communications were reviewed with him.   In other words, my review of the video indicates that the Defendant will have an adequate ability to review and evaluate such evidence with his counsel.

As to the fourth factor, it is somewhat difficult to assess here because the Court has limited information on which to evaluate the Defendant's appreciation of the Government's evidence against him.   In fact, as discussed above, the Defendant did not want to discuss the charges against him with Dr. Sunder.   However, the Defendant did articulate at one point that evidence in a case like his could include "witnesses, cell phone . . . computer."   [DE 43] at 21.   Moreover, as the video of the Defendant's interrogation shows, the Defendant seemed to be able to adequately converse with law enforcement regarding the communications at the heart of this case.

The fifth and sixth factors are obviously significant.   The Eleventh Circuit has explained:

> A criminal defendant represented by counsel generally has limited responsibilities in conducting his defense: primarily, recognizing and relating relevant information to counsel and making the few trial-related decisions reserved for defendants (i.e., whether to plead guilty, whether to request a jury trial, whether to be present at trial, and whether to testify). The defendant need not participate in the bulk of trial decisions, which he may leave entirely to counsel (how to select jurors, which witnesses to call, whether and how to conduct cross-examination, what motions to make, and similar tactical decisions).

*Watts v. Singletary*, 87 F.3d 1282, 1288-89 (11th Cir. 1996) (footnote omitted).[4]

Here, part of the difficulty in assessing the Defendant's ability to assess the propriety of taking a plea versus standing trial (the fifth factor) is that the Defendant would not talk about his case with Dr. Sunder.   Notably, when asked what details he would consider in deciding between a trial versus a plea bargain, the Defendant "shrugged his shoulders and stated, 'I don't know,'" [DE 43] at 21 – an answer consistent with Dr. Sunder's opinion that the Defendant put forth little effort at times.   However, when asked if his attorney had discussed these options (trial versus plea) with him, the Defendant said, "I would rather not say," *Id.* – a statement suggesting that he did recall such discussions with his attorney but did not want to reveal them (which is consistent

---

[4] The Defendant has argued that the complex issues of deciding whether to pursue a diminished capacity defense and evaluating potential outcomes based on sentencing guidelines will present obstacles given the Defendant's intellectual disability.   But the Eleventh Circuit has rejected the argument that a defendant is incompetent because he struggles with "complex issues, areas that require critical thinking and abstract reasoning."   *Hogan*, 986 F.2d at 1373.   In *Hogan*, the Eleventh Circuit observed that "[e]ven perfectly competent defendants often do not fully comprehend the intricacies of some of the defensive theories offered by their lawyers.   That level of comprehension is not a requirement of competency."   *Id.*   Again, "[a]ll that is required is that [a defendant] has a rational as well as a factual understanding of the proceedings against him and ha[s] sufficient present ability to consult with his attorney with a reasonable degree of rational understanding."   *Id.*   Thus, some of the examples of difficult decision-making defense counsel has raised (*e.g.*, decisions related to a diminished capacity defense) seem to go beyond the competency standard that the Court must apply.   *Cf. Greene*, 767 F. App'x at 797 ("[T]he standard for mental competence does not require that a defendant have a clear understanding of legal terminology . . . .").

with his phone call expressing suspicion about Dr. Sunder trying to get him to reveal confidential information that could be used against him).

Although the Defendant would not discuss his case with Dr. Sunder, Dr. Sunder did explain in her report that she discussed several hypotheticals with the Defendant, and that she asked the Defendant to detail what he would do in those situations – whether he would take a plea or proceed to trial. *Id.* According to Dr. Sunder, the Defendant appropriately responded to each hypothetical, "considering the strength of the evidence, time offered in a plea bargain, and the risk of taking a case to trial ('losing and getting [the max time].')." *Id.* (alteration in original). The Defendant seemed to retain his understanding of plea bargaining when he met with Dr. Sunder the following week. *Id.* at 22. Notably, the Defendant did not elicit any testimony to undermine the foregoing observations reflected in Dr. Sunder's report.[5]

With respect to the sixth factor, it is unclear whether the Defendant understands that it is his right to decide whether or not to testify. None of the evidence presented in connection with the September 28, 2023 hearing directly assessed the Defendant's ability to think through this specific decision. However, the Defendant's phone call showing that his reluctance to speak with

---

[5] Defense counsel did cross-examine Dr. Sunder about the fact that her hypothetical involved "charge bargaining" (agreeing to a lesser offense than one a defendant is charged with), which is not a typical practice in this District. [DE 51] at 36-37. Counsel also asked questions pointing out that the hypotheticals did not involve implications related to the mandatory minimum, the sentencing guidelines, and collateral consequences specific to the Defendant's case. *See id.* at 37-41. However, the fact that Dr. Sunder's hypotheticals did not address these types of complications does not undermine Dr. Sunder's conclusion that the Defendant was able to evaluate potential options – like accepting a plea versus proceeding to trial based on the information given. Nor does the fact that Dr. Sunder did not test the Defendant's understanding of these specific concepts constitute positive evidence that the Defendant does not or – with sufficient explanation from counsel – cannot adequately understand the concepts and use them to make decisions. In other words, it does not constitute evidence from which the Defendant can carry his burden of proving incompetency. A more thorough exploration of these topics with the Defendant would have potentially been illuminating, but again, it was the Defendant who resisted Dr. Sunder's efforts to address any of his case specifics (albeit for seemingly rational reasons).

Dr. Sunder sprang from a fear of his statements being used against him at least suggests an ability to appreciate that he need not speak and that speaking could have negative consequences.   In other words, it suggests that he may be able (with the assistance of counsel) to evaluate the risks of opting to testify.   Moreover, should the Defendant choose to testify, the video of his interrogation does reveal that the Defendant has the ability to coherently answer questions and to do so without just readily agreeing with whatever is asked.   At the same time, he is unlikely to be able to testify as intelligently as the average criminal defendant.   Nonetheless, the Defendant has not shown that he will be unable to make an objective decision regarding whether or not to testify, and he has not shown that – if he does testify – he will be unable to testify in an intelligent, coherent, and relevant manner.

The seventh and eighth factors are also somewhat difficult to evaluate.   At the two hearings before me, the Defendant seemed calm.   There was no sign of the agitation described at his first competency hearing before the District Court.   *See* [DE 39] at 167-70.   Yet, while the Defendant appeared awake, he did not appear particularly engaged.   For example, I did not observe him discussing testimony with his attorney.   However, the Defendant's WMI score (89), which was higher than his other scores, may suggest some ability to follow and absorb testimony during trial.   Dr. Sunder did testify that the Defendant's WMI score, which bears upon his ability to take in, manipulate, and be able to recall information was "low average, actually almost average." [DE 51] at 45.[6]   At any rate, neither Dr. Sunder nor either party specifically addressed

---

[6] The Defendant has averred that the maker of the WAIS-IV test has warned that a WMI score may be less reliable for someone experiencing anxiety.   *See* [DE 37]; [DE 51] at 98-100.   Dr. Sunder acknowledged that anxiety could affect test results, but she credibly explained that if the Defendant was experiencing anxiety at the time he was tested, his WMI score (89) would have likely been higher (not lower) without that anxiety.   *See* [DE 51] at 100 ("I can say even if he was very anxious and very worried, he still obtained an 89, which is low average. So which would

the Defendant's ability to remain sufficiently alert and responsive so as to follow and recognize any discrepancies in the testimony of witnesses.

Furthermore, as indicated in my discussion of certain factors above, the video of the Defendant's post-arrest statements to law enforcement does tend to show that the Defendant will have the ability to provide factual information to counsel and to assist counsel in understanding what happened factually.   When discussing the video in her report, Dr. Sunder stated:

> While [the Defendant] did not discuss the alleged events with me, it is important to note how he discussed the events in the video documenting law enforcement interviews. He is able to respond to open ended questions with information and clarify his position on many aspects. Despite having ID at that time, this did not appear to impair his ability to discuss the circumstances. He even asked on two occasions what his charges were going to be, and if there was a possibility to obtain bail. It is likely he can similarly discuss the events with an attorney at this time, should he choose to do so.

[DE 43] at 23.

Based on my own independent review of the video, I agree with Dr. Sunder's observations. In particular, the Defendant was able to answer open-ended questions, provide relevant, responsive information, and converse in a manner that indicates he has the ability to discuss his case with counsel.   At the outset, the Defendant was able to recall his date of birth, social security number, address, and cell phone number.   He was also able to provide details related to his Cash App account.   Thereafter – though unclear if this has anything to do with the charges against the Defendant – the Defendant provided information about a woman he asserted was trying to blackmail him.   He readily recalled her name and information about her phone number.   He remembered her area code, discussed how he did a reverse phone lookup, and recalled that her

---

suggest if he wasn't anxious, he would actually score higher.").   Thus, to the extent the Defendant was criticizing Dr. Sunder's reliance on his WMI score, any such criticism is misplaced.

number was a Missouri number.   The Defendant's ability to recall information in the video was consistent with Dr. Sunder's determination that the Defendant's memory is not deficient.

Later in the video, the Defendant answered questions related to the offenses he is charged with here.   As indicated in the Criminal Complaint [DE 1], the Defendant's charges stem from written conversations that took place between the Defendant and undercover agents, who the Defendant – at the time – believed were an 11-year-old girl and her father.   During his post-arrest interrogation, the Defendant was able to relay the names of the father and daughter, as well as the daughter's age.   The Defendant was also able to discuss her appearance.   Additionally, the Defendant was able to draw certain inferences (including that the father appeared to be communicating with him from the daughter's phone).   The Defendant also stated that he was not going to have sex with the daughter (despite his messages indicating otherwise) because doing so would "jeopardize my career."   The Defendant characterized his explicit communications with the daughter as "role play."   Overall, the video showed that the Defendant was able to recall various events, to follow and read back written conversations, and to answer open-ended questions, including to explain various communications.   Thus, the video supports Dr. Sunder's opinion that the Defendant is able to assist counsel if he is *willing* to do so.

On balance, Dr. Sunder's credible testimony, my independent review of the video of the Defendant's post-arrest statements, and my consideration of the relevant factors and circumstances weigh in favor of finding that the Defendant has sufficient present ability to assist counsel.[7]

---

[7] I note that defense counsel argued at the July 2023 hearing that Rules 4-1.2 and/or 4-1.4 of the Florida Rules of Professional Conduct support a finding of incompetence here.   The Defendant, however, has not provided any authority suggesting that courts look to ethical rules to inform the standard of competency.   To the extent that counsel cited these rules to show that he is fulfilling his own ethical obligations, I have no doubt that he has done so both in providing necessary information and explanations to his client and in bringing potential competency issues to the Court's attention.

IV.     <u>**CONCLUSION**</u>

Ultimately, this decision is a close call.   The Defendant clearly has intellectual deficits that make navigating this case difficult, for both him and his counsel.   Dr. Sunder recognized that it was difficult to evaluate the Defendant's understanding of his case and his ability to assist defense counsel, in no small part due to the Defendant's unwillingness to discuss his case with her. She also recognized that the Defendant's poor answers or non-answers to certain of her questions about courtroom roles at their initial meeting could be attributable to low effort or a loss of knowledge on account of the Defendant's intellectual disability.   *See, e.g.*, [DE 51] at 87-88.   But Dr. Sunder ultimately concluded – credibly, in my view – that low effort was "more palpable." *Id.* at 17, 87-88.   Part of what made Dr. Sunder's testimony particularly credible was her recognition and acknowledgement that "there is data for both sides of an opinion for competency and incompetency."   *Id.* at 80-81.   Moreover, despite two separate evaluations and multiple evidentiary hearings, the factual record demonstrating the Defendant's actual abilities in the legal context is not robust.   However, given that I find Dr. Sunder's testimony to be credible and that there are no expert opinions to the contrary (i.e., opining that the Defendant is not competent), and given that the burden is on the Defendant (which he has failed to satisfy for the reasons discussed above), I respectfully **RECOMMEND** that the Defendant be found **COMPETENT** to stand trial and/or enter a plea of guilty.[8]

The parties will have fourteen (14) days from the date of being served with a copy of this Report and Recommendation within which to file written objections, if any, with the Honorable Rodolfo A. Ruiz, II, United States District Judge.   Failure to timely file objections shall bar the

---

[8] I do note, however, that it may be necessary or appropriate at trial to provide the Defendant with certain accommodations (*e.g.*, simple language, repetition, and additional breaks).   *Cf. Deruiter*, 2017 WL 9360880, at *30.

parties from a *de novo* determination by the District Judge of an issue covered in the Report and shall bar the parties from attacking on appeal unobjected-to factual and legal conclusions contained in this Report except upon grounds of plain error if necessary, in the interest of justice.   *See* 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140, 149 (1985); *Henley v. Johnson*, 885 F.2d 790, 794 (11th Cir. 1989); 11th Cir. R. 3-1.

DONE AND SUBMITTED in Fort Lauderdale, Florida, this 16th day of November 2023.

Jared M. Strauss
United States Magistrate Judge